1   STEVEN A. SEIDEN (California State Bar No. 80649)
    **Attorney at Law**
2   **13658 Hawthorne Blvd., Suite 100C**
    **Hawthorne, California 90250**
3   **Telephone: (310) 644-5003**
    **Facsimile:  (310) 644-5924**
4   **Admitted *Pro Hac Vice***

5   **ATTORNEY FOR DEFENDANT: Rodrigo Diaz-Lopez**

6

7                    **IN THE UNITED STATES DISTRICT COURT**

8                        **FOR THE DISTRICT OF OREGON**
                                **(Portland Division)**
9

10  **UNITED STATES OF AMERICA,**          )   Case No. 3:21-CR-00104-IM-1
                                           )
11                      **Plaintiff,**     )   **DEFENDANT'S SENTENCING**
                                           )   **MEMORANDUM, AND**
12                                         )   **REQUEST FOR DOWNWARD**
                                           )   **DEPARTURE**
13               v.                        )
                                           )
14                                         )
                                           )
15  **RODRIGO DIAZ-LOPEZ,**                )   Hon. Judge Karin J. Immergut
                                           )
16                      **Defendant.**     )   Sentencing Date:  May 25, 2023
                                           )   Time:             9:00 a.m.
17  _____    )   Courtroom:        13A

18      **TO: THE HONORABLE KARIN J. IMMERGUT, JUDGE OF THE UNITED**

19  **STATES DISTRICT COURT, FOR THE DISTRICT OF OREGON; AND NATALIE K.**

20  **WIGHT, UNITED STATES ATTORNEY, DISTRICT OF OREGON, AND STEVEN T.**

21  **MYGRANT, ASSISTANT UNITED STATES ATTORNEY:**

22          **PLEASE TAKE NOTICE** that defendant, **Rodrigo Diaz-Lopez,** by and through his

23  attorney of record, **Steven A. Seiden,** hereby submits the following memorandum of Points and

24  Authorities to be considered at the sentencing hearing set in this matter on May 25, 2023 at 9:00

25  a.m. at the above-entitled court.

26          This position is based on the defense evaluation of the Presentence Investigation Report,

27  the accompanying memorandum, The Government's sentencing position and recommendations,

28  the executed Plea Agreement, the files and records in this case, and such further evidence and

                                            1

argument permitted to be presented at the time of the hearing. Through Counsel, Rodrigo Diaz-Lopez, files the following Sentencing Memorandum setting forth factors that the Court is being asked to consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Date: May 19, 2023                                    Respectfully Submitted,

/s/ *Steven A. Seiden*
**STEVEN A. SEIDEN**
**Attorney For Defendant**
**RODRIGO DIAZ-LOPEZ**

## I.
## INTRODUCTORY STATEMENT AND FACTS OF THE CASE

On February 21, 2023, the defendant, Rodrigo Diaz-Lopez, pursuant to a plea agreement, pleaded guilty to Count 3 of a three-count Indictment. In this case, in the case of <u>United States v. Rodrigo Diaz-Lopez,</u> Case No. 21-CR-00104-IM-1, specifically charged in Count (3)- a violation of Title 21 United States Code § 841(a)(1) and 841(b)(1)(A)(I), unlawfully and knowingly posses with the intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin. The Indictment also includes a forfeiture allegation. A preliminary and final order of forfeiture was filed in this case, listing one unknown homemade AR-15 .223 rifle with two magazines, and ammunition and accessories as subject to forfeiture.

Count 1 of the indictment charged the defendant and his co-defendant Luis Arturo Barahona Rodas with Conspiracy to Possess with the Intent to Distribute Controlled substances, to use a Communication Facility and Maintain a Drug-Involved premises, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(I), 843(b), 856(a), and 846. Count 2 charged the defendant with Possession with Intent to Distribute 500 grams or more of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii).

Thereafter on March 14, 2023, the defendant was interviewed, with counsel present, by the United States Probation Department, and the Presentence Investigation Report was generated therefrom. During the presentence interview the defendant was engaged in the proceedings and he was cooperative with the probation officer and demonstrated great remorse for his actions.

In the year 2021, Law Enforcement Agents from the Drug Enforcement Administration (DEA) focused on the illegal drug distribution activities of drug trafficking organization ("DTO") suspected of importing narcotics from Mexico to California, which were destined for distribution in Oregon and Washington. In January 2021, DEA agents conducted a one-pound purchase of methamphetamine from the defendant and this purchase led to the identification of Diaz-Lopez's cellphone and physical address in Gresham, Oregon. In March 2021, DEA agents were able to obtain wiretap authority for the defendant's phones and investigators intercepted multiple phone calls involving the defendant discussing the distribution of heroin, including a transaction on March 11, 2021, when the defendant agreed to sell 500 grams of heroin.

On March 21, 2021, DEA agents executed a search warrant at the defendant's residence in Gresham, Oregon. Law enforcement seized narcotics and a large sum of U.S. currency inside the residence. Inside a garage linked to the apartment, agents seized more narcotics and a rifle.

The government has thoroughly investigated this case and a detailed summary of all activities is contained within the defendant's plea agreement letter and the presentence investigation report.

Rodrigo Diaz-Lopez has fully cooperated during the entire investigation of this case and has demonstrated extreme remorse for his actions and the resulting crimes to which he has pleaded guilty. Throughout the entire criminal proceeding, Mr. Diaz-Lopez has come to appreciate the gravity of the case against him and has always understood the importance of being honest with the Government throughout the investigation and litigation of these proceedings. The defendant has been cooperative and has acted fairly and reasonably in his dealings with the government throughout this proceeding. The defendant has followed the advice of his counsel, and this honorable Court should take the such actions into consideration when sentencing the defendant.

Further, the defendant 's guilty plea was entered pursuant to Federal Rules of Criminal Procedure, Rule 11(c)(1)(B), and the defendant understands that the Court is required to consider the United States Federal Sentencing Guidelines (hereinafter, "USSG") among other factors in determining defendant's sentence. The defendant understands, however, that the United States

Federal Sentencing Guidelines are only advisory, and that after considering the Sentencing Guidelines, the Court may be free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crimes for which he is convicted. The defendant further understands that according the plea agreement executed between himself and the United States Attorney's Office, the U.S. Attorney's Office agrees not to seek any upward departures, adjustments, or variances to the advisory sentencing guideline range, or to seek a sentence in excess of that range. The defendant also understands and agrees not to seek a downward departure, adjustment, or variance from the applicable guideline range below the mandatory minimum of ten years' imprisonment.

 Mr. Diaz-Lopez has been in custody since the date of March 12, 2021. During the duration of his custody status, he has been a model prisoner and has performed admirably without any disciplinary incidents during his entire custody period. The defendant was incarcerated during the Covid-19 pandemic and was exposed to overly harsh conditions throughout his pretrial incarceration. The sentencing hearing has been set for May 25, 2023.  The defendant will have served approximately 26 months and 11 days in pretrial detention, and it is anticipated that this time will be credited toward any sentence of imprisonment in this case, and the defendant makes this request pursuant to 18 U.S.C. § 3585(b).

Pursuant to the plea agreement, the defendant has fully discussed the facts of this case and has read the entire Presentence Investigation Report and fully discussed the contents of that document with his defense counsel. It should be stated that the defendant, with the assistance and knowledge given to him by his defense counsel, has voluntarily chosen to accept full responsibility for his actions, has chosen to plead guilty at an early stage in the proceedings, has chosen to waive appeal, and has resolved this matter before trial. Also, pursuant to the plea agreement, the government promised to recommend a low-end sentence of the guideline range, as long as the defendant demonstrates an acceptance of responsibility as explained within the plea agreement. The defendant has complied with the requirement regarding full acceptance of responsibility. The defendant qualifies for a three level decrease for Acceptance of Responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b). Also, the defendant expects and understands that he likely will be

4

deported and excluded from the United States, upon the completion of his prison sentence.

## II.

## DEFENDANT'S SENTENCING POSITION

**Base Offense Level** [U.S.S.G. § 2D1.1(c)(3)]:                                     **34**

**Firearm Enhancement** [U.S.S.G. § 2D1.1(b)(1)]                                 **+2**

**Acceptance of Responsibility** [U.S.S.G. § 3E1.1(a),(b)]:                  **-3**

**Downward Departures:**                                                                          **-3**

   **(1) Family Ties and Responsibilities** [U.S.S.G. § 5H1.6]

   **(2) Physical Condition; Appearance, Physique, including Drug and**

      **Alcohol Dependence or Abuse** [U.S.S.G. § 5H1.4]

**Total Adjusted Offense Level:**                                                            **30**

The defendant hereby requests this Court to sentence him to **Offense Level 30**, **Criminal History Category III**, and grant the downward departure request and sentence him to 121-151 months in prison. He further requests to be sentenced at the low-end of the guidelines to a term of **121 months** imprisonment, followed by three (3) years of supervised release, and waive all fines, due to an inability to pay.

## III.

## OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Defendant Rodrigo Diaz-Lopez has no objections to the presentence investigation report.

## IV.

## ADJUSTMENTS , VARIANCES, AND DOWNWARD DEPARTURES

## UNDER THE UNITED STATES SENTENCING GUIDELINES

The United States Supreme Court has solidified their stance in regards to federal sentencing and it has held that the United States Sentencing Guidelines are advisory, and that the advisory guideline range is now but one of several factors to weigh when formulating a sentence. *United States v. Booker* (2005) 543 U.S. 220, 125 S. Ct. 738. Although the Guidelines are no longer mandatory, *Booker* makes clear that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." *Id.* Core principles in sentencing have now been

resolved by the Supreme Court holdings in : *United States v. Rita* (2007) 551 U.S. 338, *Gaul v. United States* (2007) 552 U.S. 38, and *Kimbrough v. United States* (2007) 552 U.S. 85.

In *United States v. Booker* (2005) 125 S. Ct. 738, 745-771, the United States Supreme Court confirmed that the United States Sentencing Guidelines were mandatory, that these guidelines represented the maximum permissible punishment, and that the Sixth Amendment to our Constitution and the Court's holding in *Blakely v. Washington* (2004) 124 S. Ct. 2531, 159 L. Ed. 2d 403, applied to the guidelines. However, seeking to avoid the application of the aforementioned broad constitutional protections to the federal sentencing process, in an Orwellian fashion, the remedial portion of *Booker* severed 18 U.S.C. § 3553 (b)(1)(2004), and demoted the mandatory guidelines to simple advisory guidelines that make up part of a broader sentencing scheme. *United States v. Booker* (supra) 125 S. Ct. 738, 756-771. In *Booker,* the United States Supreme Court held that sentence ranges within the guidelines represented the maximum permissible punishment a defendant could receive. *Id.* Indeed, the majority of *Booker* affirmed that, at least since *Jones v. United States* (1999) 526 U.S. 227, and *Apprendi v. New Jersey* (2000) 530 U.S. 466, the guidelines had the same force and effect of law and represented the maximum permissible punishment that a defendant would face upon conviction for an offense. *United States v. Booker* (supra) 125 S. Ct. 738745-756.

However, in an "extraordinary exercise of authority" *Id.* at 772, the remedial portion of *Booker*, written by Justice Stephen G. Bryer, severed 18 U.S.C. § 3553 (b)(1), and held that the guidelines no longer represented the maximum permissible punishment and then, as Justice Scalia states in his partial dissent, reopened the door to use of "bureaucratically prepared hearsay-riddled presentence reports" *Id.* at 790-791, to determine the statutory minimum sentence as represented by the United States Code. *Id.* at756-771. In the end, the remedial majority applied its holdings to all cases on direct review, ordered the lower courts to *consider* the guidelines during sentencing, and ordered reviewing courts to examine sentencing appeals for "unreasonableness." *Id.* at 769.

The United States Supreme Court in *Koon v. United States* (1996) 518 U.S. 81, 116 S. Ct. 2035, encouraged district courts to exercise their authority to depart from the guidelines when

a combination of factors makes the case an atypical one. In *Koon,* the Court approved a downward departure from the sentencing guidelines based upon a combination of factors. Although, when considered individually, each factor did not support a downward departure, the Supreme Court emphasized that when considered in combination, the factors took the case out of the heartland of cases described in the guidelines. The Court specifically stated:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue. We do not understand it to have been the Congressional purpose to withdraw all sentencing discretion from the United States District Judge. *Id. at 2053*
> In setting the guidelines, the Sentencing Commission did not adequately take into account

cases that are, for one reason or another, "unusual." *Koon v. United States* (1996) 518 U.S. 81, 93. As the Commission itself stated in its Introductory Comments [Federal Sentencing Guidelines Manual, Ch.1, Pt. A, comment 4(b)]:

> "The new sentencing statute permits a court to depart from a guideline-specified sentence only when it finds 'an aggravating or mitigating circumstance...that was not adequately taken into consideration by the Sentencing Commission...'18 U.S.C. § 3553(b). Thus, in principle, the Commission, by specifying that it had adequately considered a particular factor, could prevent a court from using it as grounds for departure. In this initial set of guidelines, however, the Commission does not so limit the courts' departure powers. The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted."

Pursuant to the decision in the cases of *Kimbrough v. United States* (2007) 552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 2d 481, as well as in *Rita v. United States* (2007) 551U.S. 338, 127 S. Ct. 2456, 2465, 168 L. Ed. 2d 203, a district court has discretion to fashion a sentence that meets the goals of section 18 U.S. C. § 3553(a), even if it results in a sentence that does not strictly fit the guidelines. The question is that of what sentence is reasonable. The Ninth Circuit's view of this issue seems clear from the case of *United States v. Moreno-Hernandez* (9th Cir. 2005) 397 F. 3d 1248, 1256:

It is clear that the district court, under *Booker*, will have to at least consider the available sentence under the now-discretionary federal sentencing guidelines. That is why we resolve the question that was fully briefed and argued in this court concerning the applicability of the enhancement. By doing so, we assure that the district court will begin in this regard with the proper interpretation of the Guidelines in determining whether to exercise its discretion. Cf. *United States v. Baclaan* (9th Cir. 1991, per curium), (interpreting the district court's application of non-binding statements in the Guidelines).

Also, in the case of *Kimbrough v. United States* (supra), the holding in *Booker* was reaffirmed and solidified, the Supreme Court therein held that a trial court had broad discretion to deviate from the ranges provided by the Guidelines where the "weight-driven" Guidelines would produce an unjust result (there, the issue was the disparity between powder cocaine and "crack cocaine." In *United States v. Cook* (9th Cir. 1991) 938 F. 2d 149, the Ninth Circuit Court of Appeal remanded the case for re-sentencing in part because the district court failed to exercise its discretion, based on the erroneous belief that it lacked such discretion. The court stated, "the Guidelines are not a straight-jacket for district judges. They do give discretion to depart." *Id.* at 152. The Court also explained the Sentencing Commission guidance for departures:

> The Commission goes on to say that it "intends for the sentencing courts to treat each Guideline as carving out a "heartland," a set of typical cases embodying the conduct that each Guideline describes. When a court finds an atypical case, one to which a particular Guideline linguistically applies but where conduct significantly differs from the norm, the Court may consider whether a departure is warranted."[citation]. Race, sex, national origin, creed, religion, socioeconomic status, and the defendant's physical condition are factors that a court cannot take into account. 'With those specific exceptions, however, the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the Guidelines, that could constitute grounds for a departure in an unusual case.' *United States v. Cook* (supra) 938 F. 2d at 152-153.

A. **DEFENDANT RODRIGO DIAZ LOPEZ'S EXTRAORDINARY FAMILY CIRCUMSTANCES SHOULD BE WEIGHED WHEN CONSIDERING A REASONABLE PRISON SENTENCE**

**U.S.S.G. § 5H1.6-Family Ties and Responsibilities**

In sentencing a defendant convicted of an offense other than an offense described in the following paragraph, family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted. *U.S.S.G. § 5H1.6.*

8

**Commentary: Application Note**

    1.   <u>Circumstances to Consider</u>: (A) In General-In determining whether a departure is warranted under this policy statement, the court shall consider the following non-exhaustive list of circumstances:

(I)   The seriousness of the offense.

(ii)  The involvement in the offense, if any, of members of the defendant's family.

(iii) The danger, if any, to members of the defendant's family as a result of the offense.

(B) <u>Departure Based on Loss of Caretaking or Financial Support</u>-A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:

(I)      The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)    The loss of caretaking or financial support financially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.

(iii)   The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)   The departure effectively will address the loss of caretaking or financial support.

The United States Supreme Court in the case of *Koon v. United States* (1996) 518 U.S. 81, 116 S. Ct. 2035, encouraged district courts to exercise their authority to depart from the guidelines when a combination of factors makes the case an atypical one. *Id.* In *Koon,* the Court approved a downward departure from the United States Sentencing Guidelines based upon a combination of factors. Although, when considered individually, each factor did not support a downward departure, the Supreme Court emphasized that when considered in combination, the factors took the case out of the heartland of cases described in the guidelines. The Court specifically stated:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensure. We do not understand it to have been the Congressional purpose to withdraw all sentencing discretion from the United States District Judge. *Id* at 2053.

In support of the authority for a departure, the Supreme Court cited the United States Sentencing Guidelines:

'The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.

When a court finds an atypical case, one to which a particular guideline linguistically applies, but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.'[citation omitted]. The Commission lists certain factors which never can be a basis for departure (Race, Sex, National Origin, Creed, Religion, Socioeconomic Status, U.S.S.G. 5H1.10; lack of guidance as a youth, 5H1.12; drug or alcohol dependence, 5H1.4; and economic hardship, 5K2.12), but then states that with the exception of those listed factors, it 'does not intend to limit the kinds of factors, whether or not mentioned anywhere, that could constitute grounds for departure in an unusual case." *U.S.S.G. Ch.2, Pt. A, 4(b). Koon v. United States* (supra) 116 S. Ct. at 2044. After acknowledging that the Guidelines allowed for sentencing departures based upon any number of varied factors, which make the case unusual, the Court found as follows: We conclude, then, that a federal court's examination of whether a factor can ever be an appropriate basis for departure is limited to determining whether the Commission has proscribed, as a categorical matter, consideration of a factor. If the answer to the question is no-as it will be most of the time-the sentencing court must determine whether the factor, as occurring in the particular circumstances, takes the case outside of the heartland of the applicable Guideline. *Id.*

A multitude of circuit and district court rulings have held that under the standard set forth in *Koon v. United States*, extraordinary family circumstances may justify a downward departure when the defendant is the sole caretaker or provider for their children. See also the case of *United States v. Aguirre* (9th Cir. 2000) 214 F. 3d 1122, (The Ninth Circuit affirmed a four level downward departure where the death of defendant's husband left her son without a custodial parent. And further held that although U.S.S.G. § 5H1.6 "discourages" departures based on family ties, it would not "second guess" the district court's finding that the case involved an unusual family situation.) The *Aguirre* case is analogous and similar to the facts of our case.

Instrumental to the present case is the case of *United States v. Galante,* (2nd Cir. 1997) 111F. 3d 1029. In *Galante*, the Second Circuit Court of Appeals affirmed the district court's finding that the defendant's family circumstances were sufficiently extraordinary to merit a downward departure. In departing, the district court noted that the defendant was the sole supporter of a family consisting of a wife and two children, ages 9 and 10, who faced eviction from their residence if the defendant was incarcerated. The court also noted that the defendant's parents could not support his family, as his father was hospitalized on a life support system, and his mother was 66 years old. The Court of Appeals concluded that under these circumstances, the defendant's family circumstances were exceptional and stated:

We have read § 5H1.6 to mean that when a sentencing court determines the circumstances

related to family ties and relationships are extraordinary, the Guidelines do not bar it from considering them as a basis for a downward departure.[Citations] "This Court and other courts of appeals have recognized that a defendant's familial responsibilities may present such 'extraordinary circumstances' that a downward departure in sentencing is necessary and permissible."[Citation] "Section 5H1.6's phrasing confirms the Commission's understanding that ordinary family circumstances do not justify departure, but extraordinary family circumstances may." [Citation] In departing downward when he sentenced the defendant, the sentencing judge emphasized Galante's wife's limited earning capacity and her difficulty with English, and found that he was the principal support of a family consisting of his wife and two children, ages 8 and 9. His mother did not earn a substantial living and his father was in a critical care facility. *United States v. Galante* (supra) 111 F. 3d at 1033

## 1. Rodrigo Diaz-Lopez's Extraordinary Family Circumstances and Financial Responsibilities

Rodrigo Diaz Lopez's case, similar to the cases cited above, involves extraordinary family circumstances that should be weighed when formulating a reasonable sentence. He has had four children throughout his adult life, and they are presently age 35, 25, 17, and 16. The youngest children are Elvira Marlen Diaz-Miramontes, age 16 and Angel Rodrigo Verdugo, age 17, and they both reside in the country of Mexico. The defendant provides as much economic support as possible and prior to his incarceration he paid for all of their school expenses. He has contributed emotional and economic support throughout their lives and will reconnect with all of his children upon his return to Mexico. He provided for his children and according to the character letters that have been presented on his behalf, he has been a major paternal presence throughout their existence. During his incarceration the economic support will diminish, however all of his children will prove to be a welcoming support system for the defendant when he returns to Mexico. The children are currently under the care and supervision of their mothers, but the defendant is involved in their daily lives. The children are dependent on Mr. Diaz-Lopez for economic support in their private lives and for their educational expenses. The family situation will be an extremely difficult endeavor for the entire family during the time that he is in federal prison. They all will face extreme hardship.

Mr. Sanchez has been a very important person in his children's lives. Mr. Sanchez and his children share an exceptionally close relationship and they provide stability to one another in a

strong father/child relationship. Over the course of their lives, he has been the primary income earner for them and he provides economic, parental, and emotional support to all of his children on a constant basis. The children are fortunate to have a father and a mother to rely on for their stability, and that has allowed them the opportunity to live a normal life and to enjoy a well adjusted childhood. In the country of Mexico a child only has the opportunity to attain a quality education if they are able to afford the costs involved. The amount of money spent on each school aged child for school and athletic costs are exorbitant, and should be taken into consideration when analyzing family hardship and financial responsibilities.

It must also be stated that the defendant has been in a long-term "meretricious" relationship with Maria Sanchez-Sanchez, who also resides in Gresham, Oregon. She and the defendant have been in a relationship for four (4) years and were living together at the time of his arrest. Maria Sanchez suffered a 'brain aneurysm' and required brain surgery during their relationship. Mr. Diaz-Lopez was the main economic provider and caregiver for Ms. Sanchez, and during her recovery period. Ms. Sanchez also relied on the defendant for economic support up to the time of his arrest.

Therefore, it is likely that there will be an extraordinary family hardship and drastic change in economic circumstances regarding the defendant's school aged children and on Ms. Sanchez, if the defendant were to be incarcerated and away from the home for any considerable amount of time. Mr. Diaz-Lopez's family ties and responsibilities must be weighed in his effort to seeking a downward departure in order to return to and reunite with his family as soon as possible and to be able to continue to provide a stable family environment and financial support system for his children and significant other.

**B.  RODRIGO DIAZ-LOPEZ'S PHYSICAL CONDITION, PHYSIQUE, DRUG AND ALCOHOL DEPENDENCE OR ABUSE, MUST ALSO BE TAKEN INTO CONSIDERATION BY THIS COURT WHEN FORMULATING A REASONABLE SENTENCE**

**U.S.S.G. § 5H1.4-Physical Condition**

Pursuant to U.S.S.G. § 5H1.4, Physical Condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance,

individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be reason to depart downward. Drug Dependence or Abuse, is not ordinarily relevant in determining whether a departure may be warranted. However, Courts have taken into consideration the drug dependence of a defendant as a reason for a downward departure. Drug rehabilitation efforts may be given weight in determining whether a downward departure under the Sentencing Guidelines is warranted. *U.S. v. Cotto* (E.D.N.Y. 1992) 793 F. Supp. 64. Also, a Downward Departure from the sentencing guidelines for extraordinary likelihood of rehabilitation from drug addiction was not precluded by congressional prohibition of imposing a sentence of imprisonment for purpose of rehabilitation or by the Sentencing Commission's rejection of substance abuse as a reason for a sentence below the guidelines. *U.S. v. Davis* (D.D.C. 1991) 763 F. Supp 645.

Mr. Diaz-Lopez had been incarcerated since March of 2021 and that was during the middle of the COVID-19 pandemic. During his pretrial confinement, the defendant has suffered three (3) bouts of the Corona Virus. He was incarcerated in the Inverness jail, Sheridan FCI, and is now at the Columbia County Jail. Mr. Diaz-Lopez is 5'7" tall, and currently weighs 220 pounds. He is overweight and unhealthy. He has been diagnosed with asthma, diabetes, sleep apnea, high cholesterol, and arthritis. He is currently taking the following medications: Oxcarbazepine, Duloxetine, Pantoprazole, Atorvastatin, Clotirmazole, and an Albuterol nubulizer, for all of his ailments. Also, he has experiences persistent skin infections which resulted in a Staph/MSRA infrction, and he was forced to take antibiotics to quell that situation. The court must take into consideration severe and overly harsh conditions that the defendant experienced while in pretrial confinement, when considering a reasonable sentence.

Also, the defendant has readily admitted that he has an alcohol and drug problem, and has been using drugs and alcohol since he was fourteen years old. He abused marijuana, cocaine, methamphetamine, oxycodone pills, experimented with heroin, and prior to his incarceration he was a full-blown alcoholic. Prior to his arrest, the defendant would consume 24 beers in one day! While he was incarcerated in the year 1995 he participated in a 3-month substance abuse

treatment program. The program worked initially, but he eventually returned to substance abuse after his release. During his probation interview he indicated that he believed that he would benefit greatly from a drug and alcohol program, as he is now older and has been clean and sober during his entire pretrial incarceration. Even though Mr. Diaz-Lopez has no legal status in the United States Additionally, and he understands that he cannot benefit from the Bureau of Prisons Residential Drug Treatment Program ("R.D.A.P.") and the benefits of said program, he still intends to take advantage of any and all drug and alcohol therapy and rehabilitation programs available to him within the Bureau of Prisons.

The defendant's drug and alcohol dependence, his desire to seek rehabilitation, while keeping in mind his status as a "illegal alien" in this country, should be considered when administering a sentence that is reasonable under the circumstances pertaining to this defendant.

**V.**
**NATIONAL SENTENCING TRENDS FAVOR THE SENTENCE**
**BEING REQUESTED BY RODRIGO DIAZ-LOPEZ**

**A.**    **Harsher Sentencing of Drug Offenses Does Not Deter Crime or Reduce Drug Use**

There is a growing consensus that the threat of legal sanctions and/or heightened legal sanctions do not have a positive correlation with reduction of illicit drug use or distribution. (*See* Michael Tonry, "*The Most Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime & Justice 65 (2009). Extensive research has found little to no true public safety benefits are derived from increases in penalties, which has been found to also apply in the federal context. Between the years of 1980 and 2010, "self-reported use of illegal drugs has increased over the long term as drug prices have fallen and purity has risen." (*See* "*Federal Drug Sentencing Laws Bring High Cost, Low Return*," Pew Charitable Trusts at 1, (Aug. 2015), *https://www.pewtrusts.org.* "[T]he results show there is no substantially significant basis for believing that increasing prison admissions for drug offenses deters drug use." *See Vincent Schiraldi & Jason Ziedenberg, "Costs and Benefits? The Impact of Drug Imprisonment in New Jersey at 27 (2003), https://drugpolicy.org.*

As this widely studied, reported, and developed body of research suggests, a huge reason for this lack of a positive correlation between heightened enforcement/sanctions for drug offenses

and reduced drug distribution/use is due in large part to drug markets (such as the one present within the State of Oregon) sustained viability, irrespective of actors within that market being removed. Drug addiction creates a demand to which a supplier to that demand can be easily and readily replaced. As the Sentencing Project has noted:

> Compared to other offenses, the effect fo sentencing and incarceration of drug offenses is quite limited since drug selling is subject to a "replacement effect." For example, if an armed robber is convicted and sentenced to prison, the effect of incapacitation removes that person's crime potential during the period of imprisonment. But street-level drug sellers are often replaced quickly by other sellers seeking to make profits from the drug market. As criminologist Alfred Blumenstein has noted, "...drug markets are inherently demand driven. As long as the demand is there, a supply network will emerge to satisfy the demand. While efforts to assault the supply-side may have some disruptive effects in the short term, the ultimate need is to reduce the demand in order to have an effect on drug abuse in the society.
> (*See Ryan S. King, Marc Mauer, Malcolm C. Young, Incarceration and Crime: A Complex Relationship, available at* http://sentencingproject.org).

While there is a need to curb this epidemic in an effort to protect the public, that need is not served by simply locking away those accused of drug distribution offenses for as long as possible. When there is a sentence that can serve the aims of sentencing without incarcerating an accused a day longer than necessary, that sentence should always be imposed.

Accordingly, while defendant Rodrigo Diaz-Lopez has accepted responsibility for his criminal conduct and is extremely remorseful for the offense conduct, the imposition of a sentence greater than 121 months incarceration will only serve to continue the trend of retributive sentencing in the vein of combating this devastating epidemic. In reality, the drug epidemic is much more likely to end by either means or access to appropriate treatment for those suffering from addiction, as opposed to incarceration. Appropriate treatment will curb the demand, thus ending the public health crisis. Longer sentences only serve to incapacitate an actor in a drug market that has already been long since replaced before the imposition of sentence. To that end, Mr. Diaz-Lopez is a prime example, as his very tangential connection to the Portland, Oregon area suggests that he truly had little or no role in the local drug market to begin with.

**B.**     **Offenders with less Culpable Roles frequently receive relief from harsh Mandatory**

## Minimum Penalties

In 2011, the United States Sentencing Commission (hereinafter "Commission") analyzed sentencing trends attendant to drug offenses carrying a mandatory minimum penalty. *See* 2011 Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System (hereinafter "2011 Commission Report").  Available at *https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/mandatory-minimum-penalties/20111031-rtc-pdf/Chapter_08.pdf(last accessed February 16, 2022).* The convictions were organized by the functions performed by the drug offenders as part of the offense.  The conduct section of the presentence report was utilized to establish an individual offender's function or role in any given offense. Each offender was assigned to one function category out of a possible nine categories for analysis.  The function categories ranged from the most serious/culpable offender down to a continuum of decreasing culpability. (The nine categories were initially 21, but were reduced by the Commission to allow for easier presentation of analysis. The nine categories are as follows: 1. High-level supplier/importer; 2. Organizer/leader; 3. Grower/manufacturer; 4. Wholesaler; 5. Manager/Supervisor; 6. Street-level dealer; 7. Broker/steerer; 8. Courier; and 9. Mule.) The Commission defined a "broker/streeter" as someone who arranges for drug sales by directing potential buyers to potential sellers. The Commission defined a "courier" as an offender who "transports or carries drugs using a vehicle or other equipment." *Id.* at 167.  On the continuum of decreasing culpability identified by the Commission, "broker/streeter" is determined to be the third least culpable category, and "courier" is determined to be the second least culpable category. *Id.* at 166-167

The Commission's analysis indicated that couriers were more commonly represented in federal drug prosecutions than other offender categories, however, couriers rarely receive a mandatory minimum drug penalty. As a function class, couriers represented the most common offender category comprising 23.0% of all drug offenders. *Id.* at 168. In sum, 90% of couriers were not sentenced to a mandatory minimum penalty despite couriers representing the largest function category of drug offender identified by the Commission. *Id.*

Accordingly, Rodrigo Diaz-Lopez would likely fall into either a broker/steerer or a

courier category. He was not a high-level supplier or importer, organizer or leader, grower or manufacturer, or manager/supervisor of the narcotics sales and transportation scheme regarding the drug trafficking organization. In fact, Mr. Diaz-Lopez was a trusted member of the DTO who maintained a house that contained narcotics, and that was mainly where his involvement started and eventually ended. He was mainly following directions from the higher level members and organizers of the organization. He has limited "institutional knowledge" of the Portland, Oregon drug market, and does not have great familiarity with the actual players operating inside and outside this market. His responsibility was to maintain and possess narcotics that were placed within his apartment and a detached garage, and that was the main task regarding his involvement. In the end, Mr. Diaz-Lopez took all of the risk for a point in time, while hoping to receive a small reward. It strongly appears that under the Sentencing Commission's analysis, the defendant fits within the definition of a 'Broker/Steerer' or 'Courier.'

Accordingly, while Mr. Diaz-Lopez has accepted responsibility for his criminal conduct and is extremely remorseful for the offense conduct, the imposition of a sentence greater than 121 months incarceration will only serve to continue the trend of retributive sentencing in the vein of combating this devastating epidemic. In reality, the drug epidemic is much more likely to end by either means or access to appropriate treatment for those suffering from addiction, as opposed to incarceration. Appropriate treatment will curb the demand, thus ending the public health crisis. Longer sentences only serve to incapacitate an actor in a drug market that has already been long since replaced before the imposition of sentence.

Therefore, federal prison sentence beyond 121 months will not benefit Mr. Diaz-Lopez and his requested sentence is appropriate punishment.

## VI.

## SENTENCING FACTORS PURSUANT TO 18 U.S.C. § 3553(a)

According to 18 U.S.C. 3553(a), the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The United States Court of Appeals for the Ninth Circuit has held that the "overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to

reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *United States v. Carty* (9th Cir. 2008) 520 F. 3d 984, 991. In doing so, the court concluded that all sentencing procedures are to begin by correctly determining the applicable Guidelines range, "In this sense, the Guidelines are 'the 'starting point and the initial benchmark,'" *Kimbrough v. U.S.* (supra) 552 U.S. 85, quoting *Gall v. U.S.* (supra) 552 U.S. 38, and are kept in mind throughout the process. The parties must be given a chance to argue for a sentence they believe is appropriate. *United States v. Carty* (supra) 520 F. 3d at 991. These factors should be taken into consideration in imposing the defendant's sentence.

The district court should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties, i.e., it should consider the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the kinds of sentences and sentencing ranges established in the Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims. *18 U.S.C. § 3553(a) (1)-(7); Gall v. U.S.*(supra) 552 U.S. 85; *United States v. Carty* (supra) 520 F. 3d 991.

Defendant Rodrigo Diaz-Lopez submits that the following factors support a sentence of 121 months in federal prison. Further, the government and defendant have agreed that the defendant may argue for a sentence pursuant to 18 U.S.C. § 3553(a).

## A. The Nature and Circumstances of the Offense-18 U.S.C. § 3553 (a)(1)

The facts and allegations against Rodrigo Diaz-Lopez have been investigated and effectively presented in this matter by all parties involved and they are well known to all at this time. There was no violence or threats of violence demonstrated by the defendant. Mr. Diaz-Lopez's role in this case was one of an average narcotics dealer who was exposed to the narcotics sales game at an early age and has suffered throughout his adult years, due to his poor decisions. He was born and raised in the Nayarit, Mexico and oftentimes many young men are recruited into

the narcotics trade in that region of Mexico. His chosen profession may be one of the reasons that he suffered such a difficult life up to this point. The defendant decided to involve himself in narcotics trafficking primarily to support himself and his family. The charge to which he pleaded guilty arose from Mr. Diaz-Lopez admitting that he utilized his abilities as narcotics courier and used his residence to hold the narcotics prior to delivery. It should also be noted that Rodrigo Diaz-Lopez merely sold his narcotics for the true owners of the narcotics otherwise known as high level suppliers and importers, organizers and leaders, and manufacturers. And, this is how Mr. Diaz-Lopez's role in this matter should be characterized in conjunction with the others who were part of a vast drug trafficking organization.

The duration of Mr. Diaz Lopez's narcotics distribution began in 2019 until his arrest in March 2021. He was an ordinary narcotics trafficker and it is apparent that there were many others who were in higher positions than he and they should be viewed as the real master minds of the narcotics operation. Further, it is evident from the defendant's own actions and through the PSR that he is extremely remorseful for his actions and for the harm he has caused as a result. Mr. Diaz-Lopez deeply regrets his errors in judgement, for failing his family, and he accepts full responsibility for his actions in total. And he has demonstrated his remorse through his actions while incarcerated over the last 26 months. He has remained a model prisoner and has worked in the kitchen on a consistent basis. He demonstrated good character and was respectful toward all staff in each facility throughout his pretrial incarceration. He had no misconduct allegations or write ups and worked multiple jobs as kitchen worker. Overall he was a very responsible inmate who worked diligently with his defense counsel to prepare his case for sentencing.

**B. The History and Characteristics of Rodrigo Diaz-Lopez-18 U.S.C. § 3553(a)(1)**

The history and characteristics of Rodrigo Diaz-Lopez demonstrate that the requested sentence in this matter is appropriate to achieve the rehabilitative goals of sentencing. The defendant is someone who had a difficult childhood and lacked the economic means to attain a quality education. He was fortunate to complete 12 years of education in Mexico, and did graduate from high school. Mr. Sanchez is a 53 year old male of Mexican descent. He was born in Nayarit, Mexico in 1969, and his parents were married, but he was raised in a very poor family.

He was raised by both parents and he has five brothers and four sisters. Mr. Diaz-Lopez grew up in Nayarit, Mexico and was raised by both of his parents, with whom he had a good relationship. His childhood was difficult, as his father worked extremely hard to provide for his large family. When he saw that his father was struggling financially, he left the home at age 17 decided to take care of himself. He started drinking alcohol and drugs at this time in his life.

He had his first child at the age of 18 and his second child at the age of 28. Then, he had two more children at the age of 35 and 36. Mr. Diaz-Lopez did not have any solid educational foundation did not attend college or any vocational school. He has expressed a desire to take advantage of the educational vocational opportunities within federal prison. He knows that he must find a new occupation. Also, Mr. Diaz-Lopez is fluent in Spanish and has expressed the desire to learn to read, speak, and write in the English language. Said skills should prove useful in his future employment endeavors.

Therefore, the defendant has family support and should have employment opportunities upon release, and he intends find quality employment upon release. Essentially Mr. Diaz-Lopez has realized that his thinking and life decisions have brought him to a dead end, which is a federal prison sentence and federal felony convictions. And all of this will result in his deportation from the United States.

Mr. Diaz-Lopez has had an awakening during the pendency of this case and during the last 26 months behind bars. He has had the time to reflect on his entire life and the poor decisions he has made over the last thirty years. Upon the completion of his prison term he has a desire to re-enter the work force so that he may provide for his children and family. Therefore, at this juncture and point in his life he is not someone who has a predisposition to commit future crimes, as this case has taken an enormous toll on him and his entire family. And the positive aspect of this situation is he has the potential to successfully return to his community as a productive member and law-abiding citizen. He has performed admirably during the time of his present incarceration over the last 26 months.

The requested sentence is appropriate to achieve the rehabilitative goals of sentencing a man who has had serious contacts with the criminal justice system, has taken advantage of all of

the opportunities available to him under the United States Sentencing Guidelines, and any chance of recidivist behavior is highly unlikely.  Therefore, given the performance of Mr. Diaz-Lopez thus far in his case and his exemplary behavior as a model inmate during his incarceration period, is evidence that he is someone who does not possess a predisposition to commit crimes and any chance of future criminal activity is extremely low.

**C.  The Need For The Sentence Imposed—To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment for the Offense, To Afford Adequate Deterrence to Criminal Conduct, and To Protect the Public from Further Crimes-18 U.S.C. § 3553(a)(2)(A-C)**

The Court must impose a sentence that reflects the seriousness of the offense and to promote respect for the law and to provide a just punishment for the offense. The sentence that the defendant is requesting is adequate to demonstrate to the defendant that the offense for which he is being sentenced is serious and that people throughout the United States as well as the general public were damaged as a result of his actions. Said sentence will meet the concerns of *18 U.S.C. § 3553(a)(2)*, which is the need to reflect the seriousness of the offense and promote respect for the law.  As a federally convicted felon and a likely deportation order from the United States, Mr. Diaz-Lopez has come to realize that his actions were of a serious nature and he has been put through a serious federal criminal case that has placed great hardship on himself and his entire family.  He has great respect for the process and after he had the opportunity to discuss facts and allegations against him with his defense attorney, he readily admitted his wrongdoing early in the proceedings and long before trial. By working with his attorney and realizing the seriousness of his actions in trafficking in narcotics, he now fully understands the gravity of his illegal conduct. At times when someone is surrounded by illegality, one fails to realize that what they are doing on a daily basis is actually illegal! And the defendant has demonstrated criminal behavior in the past and currently has six (6) criminal history points, which puts him in a category III. These admissions and affirmative steps taken have allowed him to start the process of serving his potential prison sentence, to change his mental outlook on life, and to start putting this traumatic experience and poor decision making behind him. This therapeutic process will enable him to realize that he has the ability to gain the skills to lead a productive and law abiding life

throughout his remaining years.

Regarding respect for the law pursuant to *18 U.S.C. § 3553(a)(2)(A)*, Mr. Diaz-Lopez demonstrated hid acceptance of responsibility for his actions, by admitting his involvement, and pleading guilty at an early stage in the proceedings. The plea agreement he entered into includes an appellate waiver, a mandatory minimum sentence, and several other concessions, which demonstrate Mr. Diaz-Lopez's appreciation for the seriousness of his actions and his willingness to take full responsibility. Also, when he was fully informed of the grand scale of this case and the type of prison sentence he was facing, he immediately admitted her guilt to save the Government the cost of a lengthy litigation process and trial costs, and chose to take advantage of the opportunities afforded him under the United States Sentencing Guidelines. Moreover, the general deterrence purposes of §3553(a) will not be advanced by warehousing an offender like Mr. Diaz-Lopez, who committed a crime at a time of being ill informed of the gravity of his actions and a demonstration of poor judgment. The enormity of the criminal process, the horrific and dire conditions of his pretrial incarceration, and the fact that he has been publicly humiliated in his own community is enough of a deterrent to ever think that he will ever return to the narcotics trade in the future.

The type of sentence being requested in conjunction with supervised release will not jeopardize the safety of the community, because the defendant will likely be deported from the United States. He will not be returning to the United States. And with a his family responsibilities and others who rely on him for support, the defendant will have no choice except to strive to remain productive and crime free. *18 U.S.C. § 3553(a)(2)(c)*. This litigation and pretrial incarceration in this district and contact with the federal criminal justice system is an a serious offense, and has had a serious impact on the defendant and should viewed an ever greater deterrent to commit future crimes. *(18 U.S.C. §3553(a)(2)(c)*.

Additionally, according to *18 U.S.C. § 3553(a)(2)(D)*, Mr. Diaz-Lopez intends to take advantage of the educational and vocational programs afforded to him in order to train for an alternate profession. He has the foundational skills to train and develop into a new profession. He admitted to the probation officer that he has had a drug and alcohol problem. He also

demonstrated to his attorney and the probation officer that he needs therapy in order to remain drug and alcohol free. He also has a friendly personality and possesses experience in the roofing industry and the culinary arts, and he will be able to enhance his skills while he is incarcerated in order to gain employment upon release.  It appears that Mr. Diaz-Lopez intends to emerge from this experience with a new attitude and will have the ability to re-build his life and employment opportunities in order to provide for himself and continue to provide stability for his family.

**D.  The Kinds of Sentences Available-18 U.S.C. § 3553(a)(3)**

Ms. Diaz-Lopez fully understands that the mandatory minimum and the maximum sentence available for which he has pleaded guilty in this matter is: Ten years up to life imprisonment.  And based on the actions taken by this defendant to date, a sentence of 121 months in federal prison is within the power of this court to administer such a sentence. Considering that this case did not involve violence and all of the affirmative steps that he has taken to help rehabilitate and reform himself thus far in order to garner a reduced sentence, this honorable court should sentence him to the requested term of 121 months in federal prison. Said requested sentence would not be disproportionate to a sentence that any defendant would generally receive based on the circumstances and evidence in this matter. *18 U.S.C. 3553(a)(3).*

**E.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records and Who Have Been Found Guilty of Similar Conduct-18 U.S.C. § 3553(a)(6)**

When considering the requested sentence, this court should also consider a district court's sentence must be formulated in light of the factors set forth in 18 U.S.C. § 3553(a), which specifically include the "need to avoid unwarranted sentence disparities," *See* 18 U.S.C. § 3553(a)(6); *See also* 28 U.S.C. § 991(b)(1)(B); U.S.S.G. Ch. 1, Pt A, ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.")

In *United States v. Daas* (9th Cir. 1999) 198 F. 3d 1167, the Ninth Circuit noted that, a central goal of the Sentencing Guidelines is to eliminate sentencing disparity. *Daas* citing *Koon v. United States* 518 U.S. 81 (1996). The Ninth Circuit has repeatedly held that it is appropriate for district courts to take into account sentencing disparities when imposing a sentence. *See United*

*States v. Tzoc-Sierra* (9th Cir. 2004) 387 F. 3d 978 (in drug case the Ninth Circuit affirmed the district court's downward departure from 46-57 months to 36 months on basis of disparity sentences received by co-defendants). Consistent with the goals of the Sentencing Guidelines and 3553(a), this Court has discretion to equalize any potential sentencing disparities.

The co-defendant in this case, Luis Arturo Barahona Rodas, was sentenced to 41 months in federal prison. His sentence stems from a companion case and his indictment was dismissed in the present matter. While Mr. Diaz-Lopez recognizes that there are differences between the two defendants and cases, his conduct is parallel to that of Barahona Rodas. And the facts and circumstances surrounding the sentencing issues of both defendants obviously take differing directions. Therefore, to avoid an unwarranted sentencing disparity this court should analyze the conduct and overall positions of similarly situated defendants. As a result, Mr. Diaz-Lopez maintains that when considering his position and background, and to avoid unwarranted sentencing disparities, a 121 month custodial sentence is appropriate.

## VII.
## WITH THE CURRENT COVID-19 CRISIS AND THE "CARES ACT," THE DEFENDANT REQUESTS THE COURT TO TAKE HIS IMMIGRATION STATUS AND "POOR HEALTH CONDITION" INTO CONSIDERATION

While the federal prisons have historically been and remain overcrowded, and adding the issue involving Covid-19 to the equation, going to a federal prison is a risk and could result in death. Courts have also recognized that the Bureau of Prisons response to the Covid-19 pandemic has resulted in the types of overly harsh conditions a sentencing court should consider then deciding to reduce a sentence. *See United States v. Scully* (D. Or. 2021) 529 F. Supp. 3d 1190, 1192. Congress has recognized the problems within the Bureau of Prisons. On March 27, 2020 Congress passed the CARES act and authorized the Attorney General to increase the use of home confinement. (See *Coronavirus Aid, Relief, and Economic Security Act,* Pub. L. No. 116-136, § 6002, 134 Stat. 281, 516 (2020) ("Cares Act"). To date there have been approximately 296 Covid-19 related deaths within the BOP. (*Federal Bureau of Prisons statistics-May 18, 2023).*

Mr. Diaz-Lopez has no legal status in this country and it is highly likely that he will be deported to Mexico at the end of his prison sentence. Federal Courts across the country and the

United States Supreme Court have held that a convicted felon's 'immigration status' and deportation are characterized as some of the most severe consequences resulting from a criminal conviction. *Padilla v. Kentucky,* 559 U.S. 356 (2010). The U.S. Supreme Court further held that a defendants deportation is a fundamental, direct, and severe consequence of the conviction itself. The Supreme Court has also held, "Deportation is nevertheless intimately related to the criminal process." *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1038 (1984).

Further, Mr. Diaz-Lopez illegal status will severely affect his opportunities within the Bureau of Prisons during his lengthy prison sentence. His designation will be affected, he will not be afforded the opportunity attain early release benefits, and will not be afforded the opportunity to participate in the RDAP program pursuant to 18 U.S. C. § 3261(e). Also, as a result of his immigration status, the defendant will be prevented from benefitting from the First Step Act, such as "Earned Time Credits," pursuant to 18 U.S.C. § 3624(d)(4)(E), and First Step Act programs. In the end the defendant will serve his time and only receive sentence reduction with the potential to earn 54 days of good behavior credit per year. The defendant will face deportation towards the end of his lengthy sentence and that process will likely result in him being placed in a new detention facility, in order to litigate his immigration issues in Immigration Court.

## VIII.
## CONCLUSION

For the foregoing reasons and all evidence to be presented at the sentencing hearing, Rodrigo Diaz-Lopez hereby requests this honorable Court to grant his request for downward departure to a level 30, and to impose a sentence of 121-151 months imprisonment, with a low-end sentence of 121 months, three (3) years of supervised release, and to waive all fines due to an inability to pay. Further, it is the defendant's contention that said requested sentence of 121 months, is sufficient but necessary to comply with the goals of federal sentencing in this case.

Dated: May 19, 2023                                  Respectfully Submitted,

                                                     /s/ *Steven A. Seiden*
                                                     **STEVEN A. SEIDEN**
                                                     **Attorney For Defendant**
                                                     **RODRIGO DIAZ-LOPEZ**